Slip Op. 23-162

## UNITED STATES COURT OF INTERNATIONAL TRADE

---

SWEET HARVEST FOODS,

                    Plaintiff,

      and

EXPORT PACKERS COMPANY LIMITED, HONEY HOLDING I, LLP DBA HONEY SOLUTIONS, SUNLAND TRADING, INC., NATIONAL HONEY PACKERS & DEALERS ASSOCIATION (NHPDA),

                    Consolidated Plaintiffs,

           v.

UNITED STATES,

                    Defendant,

      and

AMERICAN HONEY PRODUCERS ASSOCIATION, SIOUX HONEY ASSOCIATION,

                    Defendant-Intervenors.

Before: Leo M. Gordon, Judge

Consol. Court No. 22-00188

**PUBLIC VERSION**

---

## OPINION

[Sustaining ITC's final affirmative critical circumstances determination.]

Dated: November 17, 2023

    Gregory Husisian, Foley & Lardner, LLP, of New York, N.Y., argued for Plaintiff Sweet Harvest Foods and Consolidated Plaintiffs Export Packers Company Limited, Honey Holding I, LLP DBA Honey Solutions, and Sunland Trading, Inc. With him on the briefs was Jenlain C. Scott.

    Michael K. Haldenstein, Attorney Advisor, U.S. International Trade Commission, of Washington, D.C., argued for Defendant United States. With him on the brief were Dominic L. Bianchi, General Counsel, and Andrea C. Casson, Assistant General Counsel.

      <u>Melissa M. Brewer</u>, Kelley Drye & Warren, LLP, of Washington, D.C., argued for Defendant-Intervenors American Honey Producers Association and Sioux Honey Association.  With her on the brief were <u>R. Alan Luberda</u> and <u>Kathleen W. Cannon</u>.

      Gordon, Judge: This consolidated action involves the final affirmative determination of critical circumstances by the U.S. International Trade Commission ("ITC" or "Commission") resulting from the investigation on raw honey from Vietnam.  <u>See</u> <u>Raw Honey from Argentina, Brazil, India, and Vietnam</u>, 87 Fed. Reg. 33,831 (Int'l Trade Comm'n June 3, 2022) ("<u>Final Determination</u>"); <u>see also</u> <u>Views of the Commission</u>, USITC Pub. 5327, Inv. No. 701-TA-1564 (Final) (June 3, 2022), ECF No. 21-1 ("<u>Views</u>"); <u>Separate Views of Commissioner David S. Johanson</u> ("<u>Dissenting Views</u>"), ECF No. 21-2; Final Staff Report, ECF No. 21-3 ("<u>Staff Report</u>"); <u>Raw Honey from Argentina, Brazil, India, and Vietnam</u>, 87 Fed. Reg. 35,501 (Dep't of Commerce June 10, 2022) ("<u>AD Orders</u>").

      Before the court is the USCIT Rule 56.2 motion for judgment on the agency record filed by Plaintiff Sweet Harvest Foods ("Sweet Harvest") and Consolidated Plaintiffs Export Packers Company Limited, Honey Holding I, LLP DBA Honey Solutions, Sunland Trading, Inc., and the National Honey Packers & Dealers Association ("NHPDA")[1] (collectively, Plaintiffs).  <u>See</u> Pls.' Mot. For J. on the Agency R., ECF No. 27[2] ("Pls.' Br."); <u>see also</u> Def.'s Resp. to Pls.' Mot. For J. on the Agency R., ECF No. 29 ("Def.'s Resp.");

---

[1] "Although all cases concerning the Vietnamese critical circumstances determination are consolidated into a single action, the NHPDA is represented by its own counsel, attorneys from White & Case LLP," of Washington, D.C. Pls.' Br. at 1.  The NHPDA did not file a separate brief, and supports the arguments raised by the other Plaintiffs. <u>Id.</u>  Neither did NHPDA appear for oral argument.

[2] All citations to parties' briefs and the agency record are to their confidential versions unless otherwise noted.

Def.-Int.'s Resp. to Pls.' Mot. For J. on the Agency R., ECF No. 34 ("Def.-Int.'s Resp.");

Pls.' Joint Reply Brief, ECF No. 37 ("Pls.' Reply").  The court has jurisdiction pursuant to

Section 516a of the Tariff Act of 1930, as amended, 19 U.S.C. §§ 1516a(a)(2)(A)(i)(I) and

1516a(a)(2)(B)(i).[3]  For the reasons set forth below, the court sustains the ITC's final

affirmative critical circumstances determination.

## I. Background

The statutory scheme governing unfair trade investigations requires a

determination by the Commission on whether imported merchandise within the scope of

a particular investigation has materially injured a domestic industry.  See 19 U.S.C.

§ 1673.  After its investigation, the ITC unanimously found that imports of raw honey from

Vietnam were materially injuring a domestic industry.  See Views at 74.  Having reached

that determination, the Commission noted that the U.S. Department of Commerce

("Commerce") had found in its investigation that "critical circumstances exist with respect

to certain producers/exporters in Argentina and Vietnam."  Id. at 61 (citing Raw Honey

From the Socialist Republic of Vietnam, 87 Fed. Reg. 22,184 (Dep't of Commerce

Apr. 14, 2022) (final affirm. AD determ. & crit. circum. determ.)[4]).  The ITC then explained

that, given Commerce's determination, coupled with the affirmative material injury

---

[3] Further citations to the Tariff Act of 1930, as amended, are to relevant provisions of
Title 19 of the U.S. Code, 2018 edition.

[4] In its final determination, Commerce noted that "because we continue to find that critical
circumstances exist, Commerce will instruct U.S. Customs and Border Protection (CBP)
to continue to suspend liquidation of all appropriate entries of raw honey from Vietnam,
… which were entered, or withdrawn from warehouse, for consumption on or after
August 25, 2021, which is 90 days prior to the date of publication of the affirmative
Preliminary Determination in the Federal Register."  87 Fed. Reg. at 22,186.

determination, the statute required the Commission to further determine "whether the imports subject to the affirmative [Commerce critical circumstances] determination … are likely to undermine seriously the remedial effect of the antidumping [and/or countervailing duty] order[s] to be issued." Id. (citing 19 U.S.C. § 1673d(b)(4)(A)(i)).

In making a critical circumstances determination, the statute directs the Commission to consider, among other relevant factors, "(I) the timing and the volume of the imports, (II) a rapid increase in inventories of the imports, and (III) any other circumstances indicating that the remedial effect of the antidumping order will be seriously undermined." 19 U.S.C. § 1673d(b)(4)(A)(ii). As part of its analysis, the Commission is to identify "the appropriate period for comparison of pre-petition and post-petition levels of subject imports from … Vietnam." Views at 66. The ITC explained that, in the past, it has "relied on a shorter comparison period when Commerce's preliminary determination applicable to the subject imports at issue fell within the six-month post-petition period the Commission typically considers." Id. Here, however, the ITC noted that the petitions were filed on April 21, 2021 and that "Commerce's preliminary determinations were issued on November 17, 2021, after the last month in the six-month post-petition period of May 2021 through October 2021." Id. at 66–67. As a result, the ITC decided to "compare the volume of subject imports six months prior to the filing of the petitions (November 2020-April 2021) with the volume of subject imports in the six months after the filing of the petitions (May 2021-October 2021)." Id. at 67.

Based on the timing and volume of imports, the rapid increase in and size of inventories, and the continued underselling of the domestic like product by wide margins,

the Commission reached an affirmative determination of critical circumstances. Id. at 73. As the ITC highlighted, "[a]n affirmative critical circumstances determination by the Commission, in conjunction with an affirmative determination of material injury by reason of subject imports, [results] in the retroactive imposition of duties for those imports subject to the affirmative Commerce critical circumstances determination for a period 90 days prior to the suspension of liquidation." Views at 62. Consequently, duties on entries of raw honey from Vietnam were made retroactive and payable on entries after August 25, 2021, rather than after the date of publication of Commerce's preliminary determination on November 23, 2021. See AD Orders, 87 Fed. Reg. at 35,502. One Commissioner disagreed, finding that the record lacked evidence that "could resolve the exact size of any diminished amount of unfairly traded merchandise that might remain." See Dissenting Views at 9–10 (noting that record lacked evidence "regarding final inventory levels of most importers and purchasers, the propensity of end users to hold inventory, actual consumption, and the rate at which fairly traded imports arrived immediately before the order to replace unfairly traded ones").

Plaintiffs then challenged the ITC's affirmative critical circumstances determination, maintaining that the ITC focused on the incorrect period to evaluate whether critical circumstances existed. Plaintiffs raise several legal and factual arguments that all share a fundamental theme, namely, that the ITC failed to consider or afford adequate weight to the most recent data on the record, which, in turn demonstrated that the critical circumstances imports were not "likely to undermine seriously" the AD Orders.

Plaintiffs first argue that the ITC's determination was not in accordance with law because the agency issued its determination without analyzing contemporaneous inventory information as required by § 1673d(b)(4)(A).  See Pls.' Br. At 2–3.  Plaintiffs maintain that the Commission failed to correctly interpret § 1673d(b)(4)(A)(i), as well as § 1673d(b)(4)(A)(ii)(II).  See id. at 8 (highlighting standard for ITC critical circumstances analysis that Commission must find that subject imports are "likely to undermine seriously the remedial effect of the antidumping order to be issued"); id. at 12 (emphasizing that "[i]t is the methodology and determination of the Majority relating to [§ 1673d(b)(4)(A)(ii)(II)] that is the subject of this appeal.  Merely analyzing whether there is an increase of imports does not complete the analysis; as the statute requires, there also must be evidence to show that those imports would have a specific effect, which is to seriously undermine the remedial effect of the order."); see also Pls.' Reply at 2–11 (substantially developing argument that ITC erred by failing to properly interpret phrase "order to be issued" in § 1673d(b)(4)(A)(i)).

Plaintiffs alternatively maintain that, even if the ITC's determination is in accordance with law, the ITC incorrectly applied the statute by relying upon unreasonable assumptions to fill in missing inventory data, ignored contrary evidence on the record, and ultimately reached an unreasonable determination based on incomplete and outdated data.  See Pls.' Br. at 2–4, 18–35.

## II. Standard of Review

The court sustains the Commission's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in

accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).  More specifically, when reviewing agency determination, findings or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole.  Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006).  Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting a reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2023).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record."  8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2023).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–845 (1984), governs judicial review of the Commission's interpretation of the Tariff Act. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (An agency's "interpretation governs in the absence of unambiguous

statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

### III. Discussion

### A. Legal Arguments

As a threshold matter, Plaintiffs challenge the Commission's interpretation of 19 U.S.C. § 1673d(b)(4)(A)(i), which provides that "[t]he final determination of the Commission shall include a finding as to whether the imports subject to the affirmative determination under subsection (a)(3) are likely to undermine seriously the remedial effect of the antidumping duty order to be issued under section 1673e of this title."  See 19 U.S.C. § 1673d(b)(4)(A)(i).  Specifically, Plaintiffs argue that the plain meaning of the words "order to be issued" in the statute clearly demonstrates congressional intent to require the ITC to engage in a forward-looking analysis to determine whether any increased critical circumstances imports at the time of the issuance of the order are in a position to "undermine seriously" the impact of the final antidumping duty order.  See Pls.' Br. at 14–16, 18 (concluding that "[t]he statute specifically requires that the Commission evaluate inventory levels as a means of determining whether, at the time of the issuance of the order, there are sufficient levels of the critical circumstances entries in existence to 'undermine seriously' the remedial effect of the order.  With the record containing no information regarding the inventory levels of the critical circumstances entries at the time of the order, or any information regarding the inventories held by end-users, the Dissent correctly concluded that there was no basis to determine that the statutory standard was met."); see also Oral Argument at 00:04:05–00:04:50 (July 18, 2023), ECF No. 50

(Plaintiffs' opening argument, relying on <u>Chevron</u>, is that "this case, at its heart, is a case about statutory construction…. [which] starts and stops with the plain language of the statute"); Pls.' Reply at 2–11 (substantially developing argument that ITC erred by failing to properly interpret phrase "order to be issued" in § 1673d(b)(4)(A)(i)).

Plaintiffs' legal arguments are presented in a confusing manner, with Plaintiffs initially arguing that the meaning of the statute is clear, before conceding shortly thereafter that the statute is silent as to the specific timing issue challenged here.  <u>Compare</u> Pls.' Br. at 12 (arguing that "where 'Congress has directly spoken to the precise question at issue,' <u>as it has here</u>, the agency is required to follow that directive" (emphasis added)), <u>with</u> <u>id.</u> at 14 (conceding that "[t]he time period to be used in evaluating inventory levels is not specified in the statute.").   When asked to square this apparent contradiction, Plaintiffs maintained that their legal argument consists of two parts, with the first focusing on the clear "general intent" of the language in § 1673d(b)(4)(A)(i), and in particular, the remedial effect of the "order to be issued."   <u>See</u> Oral Arg. at 00:06:06–00:07:17 (explaining that argument should be considered under <u>Chevron</u> step 1); <u>see also</u> Pls.' Reply Br. at 7–11 (arguing "the Statute, the Legislative History, and Recent Precedent of this Court" with respect to the statutory phrase "Remedial Effect of the Order to Be Issued").   Plaintiffs' counsel then explained that its concession as to statutory silence related to a different provision, namely § 1673d(b)(4)(A)(ii) not § 1673d(b)(4)(A)(i).   Oral Arg. at 00:07:17–00:08:04,  00:15:15–00:19:41 (explaining that this more specific argument should be considered under <u>Chevron</u> step two).   Unfortunately, counsel's attempt at oral argument in clarifying Plaintiffs' legal position does not accurately reflect

the arguments made in their briefs.  Regardless, Plaintiffs' clarification fails to persuade the court that their statutory interpretation is meritorious.

Beyond reciting the <u>Chevron</u> step one standard that an agency must follow a statutory directive where "Congress has directly spoken to the precise question at issue," Plaintiffs' arguments do not demonstrate how Congress has spoken directly, nor how the plain language of § 1673d(b)(4)(A) compels their desired outcome.  <u>See</u> Pls.' Br. at 12 (providing sole citation to <u>Chevron</u> in all of Plaintiffs' briefing); <u>see also</u> Oral Arg. at 00:06:10–00:08:02 (describing "general intent" of § 1673d(b)(4)(A)(i) as "clear," while acknowledging that § 1673d(b)(4)(A)(ii) is silent as to precisely what inventory data that ITC should be considering).  In developing their argument regarding § 1673d(b)(4)(A)(i), Plaintiffs characterize the dispute as "whether the Commission should examine the level of the critical circumstances inventories: (1) at the time that the suspension of liquidation occurs (<u>i.e.</u>, November 25, 2021, which is fairly close to the time period actually considered by the Commission majority); or (2) based on updated inventory and other data found in the record for the final phase of the investigation (as urged by Plaintiffs)." Pls.' Reply Br. at 7-8.  Plaintiffs contend that the ITC is acting unreasonably in determining that the agency need not examine "<u>any</u> inventory data that is after the suspension of liquidation (November 25, 2021), because the 'remedial effect of the order … began upon collection of duties in November 2021."  <u>Id.</u> at 8 (citing Def.'s Resp. at 3).  Plaintiffs maintain that the ITC ignored the plain language of the statute since the relevant provision specifies that the agency's critical circumstances analysis is to focus on whether the

critical circumstances entries are likely to "undermine seriously the remedial effect of the antidumping order to be issued." Id. (quoting § 1673d(b)(4)(A) with added emphasis).

Defendant urges the court to reject Plaintiffs' view and maintains that the ITC's statutory interpretation is correct. Defendant argues that the plain language of § 1673d(b)(4)(A), when read in the context of the statute as a whole, demonstrates that the "remedial effect of the order" refers to final duties that are effective as of suspension of liquidation. See Def.'s Resp. at 11. Defendant notes that the Commission focuses its critical circumstances inquiry on the imports that entered after the filing of the petition and prior to the suspension of liquidation, at which time relief becomes effective. Id. Defendant emphasizes that "[t]he legislative history explains that the critical circumstances provision was designed 'to deter exporters whose merchandise is subject to an investigation from circumventing the intent of the law by increasing their exports to the United States during the period between initiation of an investigation and a preliminary determination by [Commerce].'" Id. (quoting ICC Indus., Inc. v. United States, 812 F.2d 694, 700 (Fed. Cir. 1987) (quoting H.R. Rep. No. 317, 96th Cong., 1st Sess. 63 (1979)), aff'g, 10 CIT 181, 632 F. Supp. 36 (1986)).

Defendant specifically notes that the "Statement of Administrative Action [("SAA")] accompanying the Uruguay Round Agreements Act indicates that the Commission should analyze the period prior to the effective date of the order as the Commission's critical circumstances determination is focused 'on whether an order's effectiveness is undermined by increasing shipments prior to the effective date of the order.'" Id. (citing H.R. Rep. 103-316, vol. I at 877 (1994)). Based on this material, Defendant concludes

that the ITC's analysis of "the likely effects of the surge in imports entering <u>prior</u> to suspension of liquidation that are normally not subject to antidumping duties" is consistent with the congressional mandate to analyze whether the imports are likely to seriously undermine the remedial effect of the order.   <u>Id.</u> (highlighting that SAA similarly directs Commerce to examine "the imports that entered after the filing of the petition and prior to suspension of liquidation").

Plaintiffs also cite to the SAA emphasizing that the statutory intent is for the ITC "to focus 'on whether <u>an order's effectiveness</u> is undermined by increasing shipments <u>prior to the effective date of the order</u>.'"   Pls.' Reply at 8 (quoting the SAA, H.R. Rep. 103-316, Vol. I at 877, with added emphasis).   Thus, while Plaintiffs and Defendant apparently agree that the statute directs the ITC to focus on the time period right before the "effective date of the order," the parties diverge on precisely what constitutes the "effective date" of the order.   According to Plaintiffs, Defendant's determination that the "effective date of the order to be issued" commences with the suspension of liquidation is unreasonable in that it wrongfully equates the commencement of provisional measures (<u>i.e.</u>, the suspension of liquidation following the publication of the preliminary determinations of Commerce and the ITC), with the issuance and publication of the AD order (as well as the corresponding issuance of final duties) following the final determinations of Commerce and the ITC. <u>See</u> Pls.' Reply at 7–11.   Plaintiffs' argument is undercut, while the Commission's interpretation is further bolstered, by the language of the <u>AD Orders</u> that provides that duties are collected on or after suspension of liquidation on November 23, 2021, except for duties on raw honey from Vietnam, which were made

retroactive by 90 days from November 23, 2021, to August 25, 2021.  See AD Orders, 87 Fed. Reg. at 35,502.  Thus, the AD Orders are, by their own terms, applicable to duties after suspension of liquidation rather than after the date of issuance of the order itself.

Plaintiffs' focus on the absence of the term "provisional measures," as well as the forward-looking nature of the phrase "order to be issued," is misplaced in light of the full context of § 1673d(b)(4)(A).  See Def.'s Resp. at 27–29.  Given the above, Plaintiffs are unable to persuade the court that the phrase "order to be issued" conveys a clear congressional intent to require the ITC to consider more contemporaneous data, i.e., data from after the suspension of liquidation.

Plaintiffs raise a separate argument relating to the interpretation of § 1673d(b)(4)(A)(i), contending that "[t]he issue before the Commission is to consider whether the exact entries of raw honey from Vietnam that entered during the ninety-day critical circumstances period are in a position to 'undermine seriously' the remedial effect of the order."  Pls.' Br. at 11.  In their reply, Plaintiffs develop this argument more fully, maintaining that "[t]he Statute Plainly States that the Entries 'Subject to the Department's Affirmative' Critical Circumstances Finding Are Exactly the Same as the Entries Where Liquidation Is Suspended Ninety Days Early."  See Pls.' Reply at 3–7.  Plaintiffs make this argument purportedly in response to Defendant's contentions that Plaintiffs have confused "the 90-day retroactive application of duties with the entries subject to Commerce's finding of critical circumstances."  Id. at 3 (quoting Def.'s Resp. at 2).  Plaintiffs begin by describing in detail Commerce's critical circumstances determination, and conclude that Defendant has apparently "confused the time period analyzed by the

Department to determine whether subject imports were 'massive' (i.e., the period between April of 2021 and November of 2021) with the actual critical circumstances entries that are "subject to the affirmative determination" (i.e., the ones that were subjected to antidumping duties by virtue of the Department's affirmative critical circumstances finding)." Id. at 6. Plaintiffs therefore contend that "there is no basis for Defendant to conclude that the Commission was supposed to analyze [whether] critical circumstances [existed] based on 'imports … entering during a longer period {than ninety days}, the period between the filing of petitions and suspension of liquidation.'" Id. at 7.

As Defendant explains, "Commerce makes its finding of critical circumstances concerning imports in the post-petition period prior to suspension of liquidation." Def.'s Resp. at 15 (citing 87 Fed. Reg. 2,127, 2,129–30 (Jan. 13, 2022) (preliminary determination of critical circumstances for Vietnam), and 87 Fed. Reg. 22,184, 22,185 (Apr. 14, 2022) (final determination of critical circumstances)). Here, the "post-petition period started in April 2021 with the filing of the petitions and ran until suspension of liquidation in November 2021." Id. The SAA directs the ITC "to determine whether the surge in imports prior to the suspension of liquidation, rather than the failure to provide retroactive relief, is likely to seriously undermine the remedial effect of the order." Id. (quoting SAA at 877). Given this, the court agrees that "the issue for the Commission was not, as Plaintiffs also incorrectly state, whether the remedial effect of the order would be seriously undermined without the retroactive application of duties for 90 days. Instead, the issue for the Commission was, as it properly analyzed, whether the subject imports entering during the period after the filing of the petition and prior to suspension of

liquidation were likely to seriously undermine the remedial effect of the antidumping duty order." Id. (internal citations omitted). This conclusion is logical given the purpose of the critical circumstances provision and the overall statutory scheme.

Plaintiffs fail to explain how or why the statute would limit the time period for the Commission's critical circumstances analysis to only the 90-day retroactive period rather than having it mirror the same period reviewed by Commerce in its critical circumstances analysis. Cf. 19 U.S.C. § 1673d(a)(3). Not only is Plaintiffs' contention that the Commission must examine current inventory levels unsupported by the statutory critical circumstances requirements, it also appears practically unworkable given the statutory deadlines and time constraints imposed on the Commission. As Defendants point out, there is a limit on the time period for which the Commission can gather data from interested parties given the statutory deadline to which it is subject and given the statutory requirements that information be released to parties and parties be permitted to comment on all record information. See Def.'s Resp. at 32–33 (explaining that Plaintiffs' demand for collecting and reviewing 2022 data "is incompatible with the Commission's final phase investigations which utilized a POI ending in September 2021," and emphasizing limitations imposed by statutory deadlines); Def.-Int.'s Resp. at 5 n.3. Overall, Plaintiffs' argument is unpersuasive as the court concludes that the ITC's statutory interpretation was not at odds with the plain language of § 1673d(b)(4)(A)(i).

Alternatively, Plaintiffs contend that the ITC misinterpreted 19 U.S.C. § 1673d(b)(4)(A)(ii)(II). See Pls.' Br. at 12. Specifically, Plaintiffs argue that, under this provision, the ITC is required to evaluate both historical data on import levels and

contemporaneous data on inventory levels, and that the ITC failed to do the latter.  Pls.'
Br. at 14–16.  Notably, Plaintiffs do not dispute that there was a substantial increase in
the "timing and volume of the imports" relevant to the ITC's critical circumstances analysis
under § 1673d(b)(4)(A)(ii)(I).    See Pls.' Br. at 12 (conceding that "Plaintiffs do not
challenge the Commission's methodology or conclusions [under § 1673d(b)(4)(A)(ii)(I)]
relating to whether imports increased.");  Oral Arg. at 00:23:48-00:23:55 ("We don't
disagree that there was a big increase in imports.").  Again, the court returns to the
Chevron framework to evaluate Plaintiffs' legal argument under § 1673d(b)(4)(A)(ii)(II),
and again the court must conclude that Plaintiffs have failed to demonstrate how they can
prevail under this standard.

As previously noted, Plaintiffs correctly recite the first step of Chevron, explaining
that where "where 'Congress has directly spoken to the precise question at issue,' … the
agency is required to follow that directive."  Pls.' Br. at 12 (arguing that Congress has
indeed directly indicated its intent under § 1673d(b)(4)(A)).  However, not more than two
pages later in their opening brief, Plaintiffs expressly concede that the "time period to be
used in evaluating inventory levels is not specified in the statute."  Id. at 14.  Following
this concession, Plaintiffs appear to abandon their arguments under Chevron and do not
address whether the ITC's interpretation comports with the statute.  Instead, Plaintiffs
maintain in a conclusory manner that "logically" the forward-looking nature of the critical
circumstances inquiry demands that the Commission review contemporaneous
information as to the inventory levels specified in § 1673d(b)(4)(A)(ii)(II).  Id. at 14–15.
Plaintiffs fail to support this argument with legislative history or other sources

demonstrating that their "logical" conclusion as to the statutory interpretation renders the ITC's interpretation impermissible.

To the contrary, Defendant provides the court with legislative history that corroborates the ITC's interpretation of § 1673d(b)(4)(A)(ii)(II).  See Def.'s Resp. at 28–29.  Defendant highlights that the ITC's focus of its critical circumstances analysis, "with respect to imports and inventories in the post-petition period prior to suspension of liquidation," makes sense given that the statute directs Commerce to focus its critical circumstances analysis on the same time period.  Id. at 28; see also Def.-Int.'s Resp. at 4–5 (highlighting that § 1673d(b)(4)(A)(ii)(II) directs ITC to consider existence of "increase" in inventories, not "what the remaining level of inventories are at some point in time after the imposition of provisional measures leading up to the Commission's vote"). Defendant further notes that the "SAA confirms that the effective date of the antidumping duty order, rather than its issuance date, is the proper time for the Commission's analysis."  Def.'s Resp. at 28 (citing SAA at 877).  Specifically, the SAA provides that the ITC is required to determine "whether, by massively increasing imports prior to the effective date of relief, the importers have seriously undermined the remedial effect of the order."  Id. at 29 & n.7 (quoting, with emphasis, SAA at 877, and noting that "[t]he language quoted above from the SAA appears in nearly 100 Commission critical circumstances determinations (by Westlaw's count) indicating that it has consistently been the effective date of relief that is important in the Commission's analysis").

Given Plaintiffs' concession, there is no dispute that the interpretation of § 1673d(b)(4)(A)(ii)(II) should be resolved under Chevron step two because the statute is

silent as to what time period the ITC should use in conducting its critical circumstances inventory analysis. Additionally, as Plaintiffs have not provided any support for their argument as to why the ITC's interpretation is impermissible under <u>Chevron</u> step two, the court agrees with Defendant that Plaintiffs cannot prevail on this issue. As Defendant explains:

> The statute provides additional guidance to the Commission, directing it to consider whether there has been "a rapid increase in inventories of the imports." 19 U.S.C. § 1673d(b)(4)(A)(ii)(II). The Commission must therefore evaluate the <u>increase</u> in inventories of the imports subject to Commerce's determination. The statute does not direct the Commission to evaluate the remaining level of inventories subject to Commerce's determination several months later when Commerce finally issues the antidumping duty order. The statute's specific reference to the increase in inventories indicates the Commission should evaluate their increase prior to provisional duties and not the manner in which the inventories are later sold.

Def.'s Resp. at 28.

In sum, Plaintiffs have failed to demonstrate that the ITC's interpretation of the plain language of the statute violated express congressional intent. <u>See</u> <u>supra</u> at pp. 8-15. Furthermore, Plaintiffs have not shown that the ITC impermissibly interpreted the statute by focusing its critical circumstances analysis on the period prior to suspension of liquidation in evaluating whether subject imports are "likely to undermine seriously the remedial effect of the antidumping duty order to be issued." Accordingly, the court sustains the ITC's interpretation of § 1673d(b)(4)(A).

## B. Substantial Evidence Arguments

Plaintiffs maintain that, even if the court rejects their legal challenges to the Commission's interpretation of § 1673d(b)(4)(A), the court should nevertheless remand the ITC's affirmative determination of critical circumstances as unsupported by substantial evidence. See Pls.' Br. at 13–35.  Specifically, Plaintiffs contend that it was unreasonable for the ITC to reach its findings without the record containing information about "the inventory levels of the critical circumstances entries at the time of the [issuance of the] order, or any information regarding the inventories held by end-users." Id. at 16–17. Plaintiffs further insist that given the state of the record, the Commission's conclusions as to the inventory levels of critical circumstances entries were "pure guesswork." Id. at 18-29.

Plaintiffs also contend that the Commission ignored "two other key pieces of evidence: (1) information demonstrating that the U.S. industry was experiencing severe shortages and the inability to supply customers at the end of the period of investigation; and (2) information demonstrating that the U.S. producers, which do not make raw honey that directly competes with the Vietnamese imports, would not be losing any sales opportunities at the bakers who rely on Vietnamese imports." Id. at 29–35.  In making these arguments, Plaintiffs rely heavily on Commissioner Johanson's dissent and urge the court to remand to allow the ITC to reach a negative final determination following the dissent's reasoning. See id. at 16–34, 36.

Before addressing the merits of Plaintiffs' substantial evidence arguments, the court will review the findings made by the Commission in reaching its affirmative critical circumstances determination. The ITC found that:

> [R]aw honey imports from Vietnam from all Vietnamese producers/exporters are subject to Commerce's affirmative critical circumstances determination. These imports increased from 48.0 million pounds in the pre-petition period to 87.9 million pounds in the post-petition period, an increase of 83.2 percent. The 87.9 million pounds of subject imports in the post-petition period are equivalent to 19.1 percent of apparent U.S. consumption in the interim 2021 period. The volume of subject imports from Vietnam in four of the six months of the post-petition period (July, August, September, and October 2021) significantly exceeded the volume of subject imports from Vietnam recorded in any prior month of the POI. In addition, subject imports from Vietnam increased rapidly in each of the first four months of the post-petition period, reversing a downward trend from December 2020 to April 2021.

Views at 69–70 (footnotes omitted). Further, the ITC highlighted that importers' inventories of imports from Vietnam subject to Commerce's affirmative determination increased almost threefold from April 30, 2021 (the last month of the pre-petition period) to October 31, 2021 (the last month of the post-petition period). Id. at 70–71 (noting that "[s]everal importers increased their inventories of subject imports from Vietnam from April 2021 to October 2021 before provisional duties came into effect in November 2021").

The ITC emphasized that it viewed the "timing of subject imports from Vietnam in the post-petition period as significant and probative." Id. at 72 (reviewing import data and explaining its finding that "[t]his timing, together with the associated volume of subject imports in the post-petition period, suggest that the volume of imports was … a deliberate

Case 1:22-cv-00192-LMG   Document 21   Filed 11/17/23   Page 21 of 32

Consol. Court No. 22-00188                **PUBLIC VERSION**                Page 21

effort to enter product into the U.S. market in substantial and increasing volumes while evading potential exposure to the retroactive application of antidumping duties"). The Commission further noted that "[w]hile apparent U.S. consumption was higher in interim 2021 than interim 2020 by 15.2 percent, importers' U.S. shipments of subject imports from Vietnam were only 2.8 percent higher, a modest increase that does not explain why importers would sharply increase their imports from Vietnam during the post-petition period." Id. It also observed that "notwithstanding higher prices, the domestic industry continued to report losses even with higher prices in interim 2021." Id. at 74. The ITC thus concluded that "[g]iven the volume and timing of imports, including the sharp increase in the volume of post-petition imports prior to the retroactive liability period under the critical circumstances provision, the rapid increase in and size of inventories, and the continued underselling of the domestic like product by wide margins, we find that the remedial effect of the antidumping duty order with respect to subject imports from Vietnam will likely be seriously undermined." Id.

The ITC next considered and rejected Plaintiffs' contentions that importers had sold off most of their inventory. In fact, the data available on the record did not support Plaintiffs' assertions. See Views at 73–74 & n. 306. The ITC was unconvinced by Plaintiffs' arguments that critical circumstances cannot exist when importers have "sold off" their inventories, explaining that "regardless of where the imported honey is in the supply chain, the volume associated with these inventories is large and increased substantially in the post-petition period and is likely to place downward pressure on prices until it is consumed by end users, particularly given the continued underselling by subject

imports from Vietnam at wide margins." Id. at 73.  While Plaintiffs maintain that the ITC's

conclusion here was based on "assumptions" and guesswork, see Pls.' Br. at 18–20,

26-29, the ITC emphasized that the record did not support Plaintiffs' fundamental

contention.  See Views at 73 n.306.  Specifically, the Commission noted that:

> One of the largest importers of subject imports[,] and the
> supplier of raw honey from Vietnam to [Customer X], []
> provided an affidavit stating 'we are not aware of any real
> build-up of raw honey from Argentina and Vietnam, whether
> in the inventories of packers such as our company or in the
> inventories of our customers.'  However, this statement is not
> consistent with the inventories it reported.   [This large
> importer] reported inventories of subject imports from Vietnam
> of [X] million pounds in March 2022-- over twice their April
> 2021 level and only 7.9 percent lower than their level in
> October 2021.

Id. (internal citations to Pls.' administrative post-hearing brief omitted).

The ITC acknowledged that the record lacked information as to "raw honey held

downstream," since even though downstream "Ingredient Purchasers fully participated

in the final phase of these investigations,"  [[


]]."  Id.

While Plaintiffs urge the court to conclude that this downstream inventory data was

essential for the ITC's analysis, the court is not persuaded that the Commission acted

unreasonably in reaching a final affirmative critical circumstances determination on the

record presented.   As pointed out by Defendant and Defendant-Intervenors, "Plaintiffs

never requested that the Commission collect the data they now claim is crucial to the

critical circumstances analysis."  See Def.-Int's. Br. at 10; Def.'s Br. at 19–22 (responding

to Plaintiffs' argument that "the Commission should have gathered 2022 inventory information from U.S. importers and end users concerning their holdings of raw honey from Vietnam" by noting that "Plaintiffs, however, did not ask the Commission to collect this information for 2022").  The court agrees that if Plaintiffs believed this information to be essential to the ITC's critical circumstances analysis, Plaintiffs' failure to request the addition of this data to the record strongly undercuts their argument that the ITC's determination was unreasonable.[5]

Plaintiffs remaining arguments are without merit.  With respect to Plaintiffs' contention that the ITC unreasonably ignored "information demonstrating that the U.S. industry was experiencing severe shortages and the inability to supply customers at the end of the period of investigation," see Pls.' Br. at 29–33, the record simply does not support Plaintiffs' position.  Plaintiffs start by explaining the logic of their argument, noting that "[t]he entire purpose of the critical circumstances determination is to determine whether there are sufficiently large inventories of subject merchandise, entering prior to the imposition of provisional measures (and thus subject to no antidumping duties), to show that it is 'likely' that those exact entries will undermine the remedial effect of the

---

[5] At Oral Argument, the parties addressed this issue and Plaintiffs confirmed that they are no longer pressing the argument that the record was incomplete and that the ITC should have collected 2022 inventory data.  See Oral Arg. at 02:10:27–02:12:18 (Plaintiffs' counsel confirming that the collection of data issue is no longer a "live issue," maintaining that Plaintiffs remaining argument about 2022 inventory data is that ITC failed to consider data that Plaintiffs had placed on the record); cf. Pls.' Reply at 15 (acknowledging that "importers and packers provided a full set of inventory data relating to inventory levels of the critical circumstances entries," while also suggesting that "it would have been preferable for the Commission to gather such information as part of its questionnaire process").

antidumping duty order." Id. at 30.  Plaintiffs reason that "[i]n light of this goal, it is critical to examine whether the U.S. industry is awash in unsold product (which would make it more 'likely' that it would lose sales to any remaining critical circumstances entries, and thus push the Commission towards issuing an affirmative critical circumstances determination) or, in the alternative, is experiencing shortages (which pushes in the opposite direction)." Id.  Plaintiffs therefore maintain that because the record reflects evidence of shortages of domestically produced honey, the Commission's failure to address and account for the impact of such shortages in its affirmative critical circumstances determination is unreasonable.

Plaintiffs point to some record evidence as demonstrating support for the conclusion that the domestic industry was experiencing "severe shortages" that would indicate that increased levels of critical circumstances entries would not be likely to undermine seriously the remedial effect of the AD Orders. Id. at 30–31.  First, Plaintiffs cite to the discussion in the Staff Report of U.S. importers' and producers' responses to questions about supply constraints. Id. ("When asked about supply constraints after the filing of the petition on April 21, 2021, 6 U.S. producers and 14 importers reported that they refused or declined to supply due to adverse climate conditions and increased logistics costs and delays. Fifteen of 20 responding purchasers reported being declined supply after the filing of the petition citing [ {Petitioner} SHA's ] inability to supply dark amber honey, COVID-related disruptions such as logistics, labor shortages, and lockdowns, and uncertainty in the market resulting from the petition. Four purchasers reported that [ {Petitioner}  SHA ] declared a force majeure and was unable to fill orders

in 2021." (quoting Pre-Hearing Staff Report, CR[6] 744 at II-9 (March 29, 2022))).  Second, Plaintiffs contend that "this information was amply corroborated" by the questionnaire responses of consumers like [[                      ]], "one of the largest bakers and consumers of raw honey in the United States."  Id. at 31 (quoting  [[                           ]] questionnaire  response  that  "[[



                                                                                      ]]").    Plaintiffs further cite to the testimony of another U.S. purchaser confirming a similar experience with Sioux Honey.  Id.  Plaintiffs conclude that "the failure of the Majority to take into account this highly relevant U.S. producer shortage and inventory information provides further evidence that the Majority's analysis is unsupported by substantial evidence."  Id. at 33.

Defendant persuasively explains why Plaintiffs' arguments about shortages are without merit.  See Def.'s Resp. at 36–39.  Critically, "[n]one of th[e] evidence relied upon by Plaintiffs to show 'severe shortages' even pertains to domestically produced honey." Id. at 37.  Rather, as was detailed in the Staff Report, the claim of force majeure, relied upon by Plaintiffs as evidence of shortages, was not the result of shortages of domestically produced honey.  Instead, it resulted from the fact that "certain shipments of imported raw honey that failed quality testing."  Id. (quoting, with added emphasis, Staff

---

[6] "PR" refers to a document in the public administrative record, which is found in ECF No. 22, unless otherwise noted.    "CR" refers to a document in the confidential administrative record, which is found in ECF No. 21, unless otherwise noted.

Report at II-9 n.21).  Similarly, Plaintiffs' reliance on the questionnaire response of [[

]] is misplaced as "[[

]]."  Id. (quoting Staff Report

at III-13(b)).  Given the full context, the court does not agree with Plaintiffs that the record

reflected evidence of "severe shortages" that the Commission failed to address in its

analysis.

Turning to Plaintiffs' contention that the ITC failed to consider "information

demonstrating that the U.S. producers, which do not make raw honey that directly

competes with the Vietnamese imports, would not be losing any sales opportunities at the

bakers who rely on Vietnamese imports," see Pl.'s Br. at 29–30, the court again concludes

that Plaintiffs' argument is unpersuasive as it does not accurately reflect the record.

Plaintiffs maintain that "The Majority Ignore[d] Uncontradicted Evidence That Any

Remaining Inventories of the Critical Circumstances Entries Could Not 'Substantially

Undermine' the Remedial Effect of the Order Because They Do Not Compete with U.S.

Production."  See Pl.'s Br. 33–35; see also Pl.'s Reply at 18–20.  Plaintiffs argue that the

Commission erred in finding that U.S. and Vietnamese raw honey were substitutable

(i.e., similar products that compete with each other in the market).  Pl.'s Br. at 33

(explaining that "the more substitutable the two types of raw honey are, the more the

Commission is pushed in the direction of an affirmative critical circumstances, because

this would increase the likelihood that any remaining inventories of the critical

circumstances entries would replace U.S. sales.").  Plaintiffs insist that the record

demonstrates that "Vietnamese raw honey has different uses than U.S.-produced raw

honey, which largely relegate them to different end uses." Id.  Specifically, Plaintiffs point

out that "In 2020, [a very large] percent of Vietnamese imports are light amber or amber

or darker honey." Id. (citing Pre-Hearing Staff Report, CR No. 744 at E-9 (Table E-6)

(March 29, 2022); NHPDA Pre-Hearing Brief, CR No. 747, at 55, n. 214 (April 5, 2022)).

"In direct contrast, in 2020, only [a very small] percent of U.S. production accounted for

amber and dark amber honey." Id. at 34 (citing Pre-Hearing Staff Report, CR 744, at E-4

(Table E-1) (March 29, 2022); NHPDA Pre-Hearing Brief CR No. 747, at 47, 54 (April 5,

2022)).   Given this information, Plaintiffs conclude that "whatever small remaining

inventories of critical circumstances raw honey existed at the time of the order were not

in a position to displace sales of U.S.-produced raw honey or to push down prices for

U.S.-produced raw honey, which is not even suitable for use in the baking sector that

relies on Vietnamese raw honey." Id.  Plaintiffs urge the court to remand the ITC's

affirmative critical circumstances determination as unreasonable given "[t]he failure of the

Majority to take into account this highly material information on the record." Id. at 35.

Defendant, in response, maintains that Plaintiffs' substitutability argument is

meritless and relies on a misstatement of the record. See Def.'s Resp. at 41–43.

As Defendant explains:

> Plaintiffs first manipulate the data by comparing the
> share of shipments of raw honey from Vietnam that was light
> amber or darker ([a very large] percent) with the share
> of shipments of domestically produced honey that was amber or
> darker [a very small] percent to argue that there was no
> overlap in shipments of honey types.  In fact, the share of
> domestically produced honey that was light amber or darker
> was 20.1 percent in 2020.  The 20.1 percent figure for light
> amber or darker shipments of domestically produced honey is

> appropriately compared to the [very large] percent of <u>light amber or darker</u> shipments of raw honey from Vietnam.

Def.'s Resp. at 41–42 (internal citations omitted). Moreover, as Defendant points out "[t]he Commission also discussed the overlap, observing that large producers' U.S. shipments were between 18 and 20 percent light amber from 2018 to 2020." <u>Id.</u> at 42 (citing <u>Views</u> at 58 n.248); <u>see also</u> <u>Views</u> at 58 n.248 ("Respondents assert that product from Vietnam is required in the market because of its dark color. However, over half of the product from Vietnam was of light amber honey during the POI, a product the domestic industry produces. Most of importers' shipments of subject imports were light amber or lighter as were the domestic industry's shipments. Further, the greatest increase in subject imports from 2018 to 2020 was in light amber, followed by extra light amber, and then the darkest honey, amber. Thus, it was not "dark" honey leading the increase in subject imports. Eighty percent of the increase in subject imports was in light amber and extra light amber. These two colors accounted for over 40 percent of the domestic industry's shipments." (internal citations omitted)). In light of the above, the court cannot agree that the ITC unreasonably failed to consider or address Plaintiffs' substitutability arguments.

Defendant also points out that its critical circumstances analysis in another action was recently sustained against a similar challenge. <u>See</u> Def.'s Notice of Supp. Auth., ECF No. 32 (Mar. 22, 2023) (citing <u>MTD Products, Inc. v. United States</u>, Court No. 21-264, Slip Op. 23-34, 2023 WL 2535885 (Mar. 16, 2023) ("<u>MTD Products</u>"), and noting that "[a]pplying the substantial evidence standard, the Court in <u>MTD Products</u> upheld an

affirmative critical circumstances determination in which the Commission considered inventories prior to the imposition of provisional duties.").

In <u>MTD Products</u>, a domestic importer filed suit challenging the Commission's affirmative critical circumstances determination resulting from the AD and CVD investigations of small vertical shaft engines from China. Plaintiff there argued that the Commission had relied on faulty data, and further argued that the majority's review of the record was unreasonable and that the dissenting view by Commissioner Johanson, <u>i.e.</u>, that the ITC should reach a negative critical circumstances determination, was the only reasonable outcome on the record. <u>MTD Products</u>, 2023 WL 2535885 at *3, *6. After reviewing the record and considering Plaintiff's arguments, the court ultimately sustained the ITC's affirmative critical circumstances determination, concluding that the ITC's findings were reasonably supported by the record. <u>MTD Products</u>, 2023 WL 2535885 at *7.

Plaintiffs respond that <u>MTD Products</u> actually supports their position because in that matter "the Commission consider[ed] the potential impact of any increased critical circumstances entries on U.S. sales that would occur long after the imposition of provisional measures, [and] the CIT explicitly affirmed the Commission on that basis." Pls.' Reply at 11–12. Specifically, Plaintiffs emphasize that the ITC in <u>MTD Products</u> made its affirmative critical circumstances determination after considering the impact of critical circumstances imports on "future sales" (<u>i.e.</u>, sales made after imposition of provisional measures imposed as part of investigation). <u>Id.</u> at 12 (citing ITC's

determination in <u>Small Vertical Shaft Engines from China</u>, Inv. Nos. 701-TA-643 and 731-TA-1493 (Final), USITC Pub. 5185 (Apr. 2021) at 50).

While Plaintiffs are correct that the ITC engaged in a forward-looking analysis in <u>Small Vertical Shaft Engines from China</u>, Plaintiffs have failed to persuade the court that the ITC failed to engage in a similar analysis here. <u>Cf.</u> Def.'s Resp. at 31 (highlighting how ITC did in fact evaluate "likely" impact of critical circumstances imports in forward-looking analysis based off of inference from 2021 import and apparent consumption level data). Plaintiffs further fail to recognize that the court in <u>MTD Products</u> considered Commissioner Johanson's dissent as part of its analysis under the substantial evidence standard. <u>See</u> <u>MTD Products</u>, 2023 WL 2535885 at *7; <u>cf.</u> Pls.' Reply at 11 (arguing that "The <u>MTD Products</u> Determination Confirms that Defendant and Defendant-Intervenor Have Advanced a Flawed Statutory Construction"). Plaintiffs thus err in concluding that "[b]oth the Commission's approach (considering the impact of the increased imports on the next selling season, after the issuance of the order) and the terms of this Court's affirmation (endorsing the analysis and emphasizing that the Commission is statutorily required to analyze future events '<u>in advance</u>'[)] demonstrates how the Commission should have proceeded in this matter." Pls.' Reply at 13–14.

As in <u>MTD Products</u>, the Commission here faced a record that demonstrated a substantial increase in inventories prior to the initiation of suspension of liquidation. In reviewing the record, Commissioner Johanson found that "the record contains clear evidence that the increase in unfairly traded subject imports in the six-month period following the petition was largely if not entirely eliminated in the next six months before

the order, and the domestic industry's condition sharply improved." Dissenting Views

at 9.  Further, Commissioner Johanson observed that "[t]he record lacks evidence that

could resolve the exact size of any diminished amount of unfairly traded merchandise that

might remain, such as evidence regarding final inventory levels of most importers and

purchasers, the propensity of end users to hold inventory, actual consumption, and the

rate at which fairly traded imports arrived immediately before the order to replace unfairly

traded ones." Id. at 9–10.  Commissioner Johanson then concluded that although it was

"possible that enough [unfairly traded subject imports] remained [in importers' inventories]

to have an impact," his review of the record did not permit him to reach an affirmative

critical circumstances finding as he could not conclude that the imports subject to the

Department of Commerce's critical circumstances determination were "likely" to

"undermine seriously" the order's remedial effect. Id. at 10.

     Given the record and the majority's analysis in both matters, the court determines

that the reasoning and conclusion in MTD Products apply equally here:

> The Commission amply explained the reasons for its
> conclusion that a surge in subject imports threatened to
> seriously undermine the duty orders' remedial effects. And
> although [Plaintiffs] dispute[] the evidentiary sufficiency of
> those findings, and urge[] the court to adopt the dissenting
> views of Commissioner Johanson, substantial evidence
> review does not permit the court to re-weigh the evidence as
> [Plaintiffs] propose[].    "The possibility of drawing two
> inconsistent conclusions from the evidence does not prevent
> an administrative agency's finding from being supported by
> substantial evidence." Siemens Energy, Inc. v. United States,
> 806 F.3d 1367, 1372 (Fed. Cir. 2015) (cleaned up) (quoting
> Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966)).
> Although the court agrees with [Plaintiffs] that the conclusion
> drawn by Commissioner Johanson is supported by the record,

> the conclusion drawn by the Commission majority—considering the record as a whole and the evidence that detracts from that conclusion—is also supported by the record.  Under the substantial evidence standard, ties go to the agency.

MTD Products, 2023 WL 2535885 at *7.  While Plaintiffs urge the court to adopt the conclusions of Commissioner Johanson's dissent as the only reasonable outcome based on the record, the court is not persuaded that the majority's determination here was unreasonable.  Overall, the four corners of the record do not support Plaintiffs' arguments that the ITC's affirmative critical circumstances determination was unreasonable.

## IV. Conclusion

Based on the foregoing, the court sustains the ITC's affirmative critical circumstances finding as to raw honey from Vietnam in the Final Determination.  Judgment will enter accordingly.


                                                  /s/ Leo M. Gordon
                                              Judge Leo M. Gordon


Dated: November 17, 2023
       New York, New York